## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| VITAL PHARMACEUTICALS, INC., ) <br> d/b/a VPX SPORTS; and ) <br> JOHN OWOC, ) <br> ) <br>        **Plaintiffs,** ) <br> ) <br> **v.** ) <br> ) <br> **BALBOA CAPITAL** ) <br> **CORPORATION,** ) <br> ) <br>        **Defendant.** ) <br> ) | Case No.:_____ <br><br><br> **JURY TRIAL REQUESTED** |

## COMPLAINT

**COME NOW** Vital Pharmaceuticals, Inc., d/b/a VPX Sports ("VPX") and John Owoc ("Owoc") (VPX and Owoc sometimes are collectively referred to herein as "Plaintiffs"), and file this Complaint against Balboa Capital Corporation ("Balboa" or "Defendant").

### I.     PARTIES

1.     Plaintiff VPX is a corporation incorporated under the laws of the State of Florida, with its principal place of business at 1600 North Park Drive, Weston, FL 33326. VPX is engaged in the sale of dietary and sports nutrition supplements and energy drinks. VPX manufactures or packages many of its products utilizing the leased equipment at issue in this action.

2.     Plaintiff Owoc is an individual citizen and resident of Davie, Florida, and President and Chief Executive Officer of VPX.

3.     Defendant Balboa is a corporation incorporated under the laws of the State of California, with its principal place of business at 2010 Main Street, 11th Floor, Irvine, CA 92614.   Balboa's primary business activity is leasing commercial equipment to lessees such as VPX.

## II.     JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a)(1) based on diversity of citizenship.   The amount in controversy in this action exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

5.     Personal jurisdiction exists over Defendant Balboa under the applicable Florida "long arm" statute. Fla. Stat. § 48.193.   Balboa is a "person" within the context of that statute.   Directly through its authorized agents and employees, Balboa conducts continuous and systematic business activities within this District, and throughout the United States.   Balboa entered into lease agreements for equipment which it purposefully placed into the stream of commerce in this District and throughout the United States. Defendant has breached multiple lease contracts with VPX for equipment leased from Balboa and installed at VPX's facilities in Weston, Florida.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant Balboa transacts business in this District, has advertised or promoted leases in this District, has received substantial revenue and profits from the leasing of equipment in this District, and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

7.      A provision in Paragraph 30 of the Master Lease Agreement between VPX and Balboa (the "Master Lease"), discussed *infra.*, provides for permissive venue in Orange County, California.  That provision, however, is not mandatory and does not preclude venue in Florida or in this District.

### III.    APPLICABLE LAW

8.      The substantive law of Florida, the forum state, including the Florida Uniform Commercial Code ("UCC") and Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq. ("FDUTPA"), governs the claims asserted in this Complaint.

9.      The Master Lease, at Paragraph 4, provides that the parties agree that the Master Lease is a "finance lease" as defined by a section of the California Uniform Commercial Code (the "UCC").  The referenced provision of the California UCC is substantially the same as the Florida UCC provision defining a "finance lease."  See FSA 680.1031(g).

10.      The Master Lease does not provide that its interpretation and application, or the assertion of claims and defenses arising under the Master Lease, are governed by California law or the law of any other state.

11.      Absent an applicable, mandatory choice of law provision in the Master Lease, Florida law is applicable to the Master Lease and the related Equipment Schedules under conflict of law principles and to the claims alleged herein.

## IV.   INTRODUCTORY STATEMENT REGARDING MASTER LEASE AND EQUIPMENT SCHEDULES

12.    VPX and Balboa entered into the Master Lease, identified as Lease No. 143467, signed by VPX's CEO Owoc on November 20, 2008.  The Master Lease is attached hereto and incorporated herein as Exhibit A.

13.    Under custom and usage of trade in the commercial leasing industry, leasing transactions typically consist of the "form" lease (here the Master Lease) and a separate equipment schedule which describes the specific leased equipment, the term of the lease, and the monthly or quarterly rental payments.

14.    There are four separate equipment schedules for each of the four leasing transactions at issue in this action.   The Master Lease applies to each Equipment Schedule.  That is, Balboa provided VPX with one Master Lease rather than a separate lease form for each Equipment Schedule.

15.    The relevant Equipment Schedules executed by the Parties and underlying this action include:

(1) Equipment Schedule 143467-001 ("ES001"), executed by Owoc on November 20, 2008.  Balboa executed the Schedule on January 9, 2009.  See Exhibit B attached hereto and incorporated herein.  The purchase price of this equipment was $107,800;

(2) Equipment Schedule 143467-003 ("ES003"), dated November 16, 2009, with a four-year lease term expiring in November 2013.  See Exhibit C attached hereto and incorporated herein.  The purchase price of this equipment was $167,359;

(3) Equipment Schedule 143467-004 ("ES004"), also dated November 16, 2009, with a four-year lease term expiring in November 2013. See Exhibit D attached

hereto and incorporated herein.  The purchase price of this equipment was $148,150; and

(4) Equipment Schedule 143467-005 ("ES005"), also dated November 16, 2009, with a four-year lease term expiring in November 2013. See Exhibit E attached hereto and incorporated herein.  The purchase price of this equipment was $89,600.

16.    Although the Master Lease and Equipment Schedules are described as "finance leases", under Florida law, the matter of whether a transaction is styled or described as a lease is not determinative.  The substance of the transaction and surrounding facts and circumstances control over the designation of a transaction as a "lease."

17.    Specifically, the principal issue is whether such a transaction is a conditional sale whereby the lessee owns the equipment at the end of the term of the initial lease, or is a "true" lease whereby the lessor retains a substantial residual value in the leased equipment. See FSA 671.201(38); Gaines, Security Interests under Article 2A: More Confusion in the Leasing Arena, 18 Stetson L. Rev. 69 (1988).

18.    Under custom and usage of trade in the industry, a typical characteristic of a conditional sale is that the lessee may purchase the equipment at the end of the initial term for what is referred to as a "$1.00" or $101.00 purchase option or other nominal consideration.  Purchase options for $1.00 or other nominal consideration are sometimes referred to as "dollar out" leases.  Under the circumstances of the four leases in issue, a purchase option for 10% of the purchase price of the equipment constitutes nominal additional consideration.

19.     Each of the four Leases and related Equipment Schedules are, in actuality, conditional sales.  Accordingly, VPX properly owned all of the leased equipment at the expiration of the term of each of these Leases.  The only "condition" in a conditional sale is that the lessee make timely periodic payments during the term of the "lease."

20.     If a transaction is a conditional sale whereby the lessee acquires ownership of the equipment at the end of the initial term of the lease, a purported provision in the lease requiring the lessee to give notice months prior to the expiration of the lease (e.g. 120 days) has no force and effect, precisely because the lessee owns the equipment at the end of term.

21.     Balboa has represented in a statement that Balboa will not attempt to enforce purported "notice" provisions included in Balboa's "dollar out" and fixed or 10% purchase option leases, and that Balboa will not attempt to automatically renew such Leases by enforcing purported pre-termination notice provisions.

22.     Nevertheless, unprincipled lessors such as Balboa frequently include an onerous notice provision in a purported "lease" document when the transaction is actually a conditional sale.  Balboa does this for the purpose of cheating and deceiving lessees such as VPX into believing that Balboa is entitled to an automatic renewal of a lease because the lessee purportedly failed to give the specified notice.  That is exactly what Balboa has done with the Master Lease and the Equipment Schedules, among other wrongful and deceptive conduct.

23.     Balboa has grossly overcharged VPX for rents after the expiration of the respective leases – when VPX properly owned all the leased equipment.

24.     Balboa also has wrongfully claimed that Balboa is entitled to require VPX to pay alleged fair market value to purchase the equipment in the range of 50% of the original purchase price of the leased equipment.  The Master Lease and the Equipment Schedules contain no such provision.

25.     Balboa is a second tier, rogue lessor which engages in a pattern and practice of calculated deception of lessees.  These practices include (a) making attractive proposals to unsophisticated lessees such as VPX, and subsequently making material detrimental changes in leases and equipment schedules without reasonable notice to lessees; (b) using deceptive "bait and switch" tactics and practices; (c) utilizing leases and related documents which are intentionally unclear and incomplete for the purpose of subsequently extracting payments to which Balboa is not entitled; (d) engaging in intentionally deceptive practices regarding end of term purchase options; (e) intentionally deceiving lessees as to whether the lessees will own the equipment at the end of the lease; (f) intentionally misusing purported notice provisions to extract improper renewals and additional rental payments from lessees; (g) intentionally sending contradictory and incomplete answers to lessees' questions during the term of leases and at the end of leases; and (h) literally refusing to provide lessees with reasonably requested information. Balboa engages in these wrongful and deceptive practices for the specific and intentional purpose of improperly increasing its profits.  Balboa subjected VPX to all of these improper practices.

26.     Balboa's conduct alleged herein is unfair, deceptive, unconscionable and in bad faith.

## V.   CLAIMS OF PLAINTIFF OWOC

27.     Owoc is named as a Plaintiff because he is a purported guarantor under the Leases.  Plaintiff Owoc signed a personal guaranty of the Master Lease on August 3, 2009, almost a year after VPX executed the Master Lease.  Said Guaranty is attached as Exhibit F.

28.     Plaintiff Owoc seeks a declaration under Count One of the Complaint that he has no liability to Balboa under any allegedly applicable guaranty because of Balboa's breach of the Master Lease and Equipment Schedules.  For that reason, any alleged guaranties are null and void.  In addition, VPX is not in breach of the Master Lease or any Equipment Schedules, and any alleged Owoc guaranty is not "triggered" for that reason.

## VI.   THE ORIGINAL PROPOSAL AND FRAUD IN THE INDUCEMENT

29.     Before entering into the Master Lease or any related Equipment Schedules, Balboa sent a Proposal to then-VPX employee Darlene Owoc, dated May 23, 2008 (the "Proposal").  The Proposal includes under the heading "Rentals" a column for "Residual Options" with two different Lease Rate Factors.  The Proposal is attached hereto and incorporated herein as Exhibit G.  The Lease Rate Factor for a "Residual Option" of "$1.00" is .01957.  There is a lower Rate Factor of .01816 for a 10% Option (meaning 10% of the original purchase price of the equipment).  Thus, the Proposal indicated to VPX that the Master Lease and any related Equipment Schedules would be conditional sales, not true leases, with either a "dollar out" payoff option, or a payoff option of not more than 10% of the purchase price and, thus, that VPX would own the Equipment at the end of the lease terms upon payment of either such nominal payoff amounts.

30.     VPX alleges, on information and belief, that, in the time period before and when Owoc executed the Master Lease and ES001 Schedule on November 20, 2008 and the ES003, ES004 and ES005 Schedules on November 16, 2009, David White, Balboa's Senior Account Executive responsible for its relationship with VPX ("White"), represented to Darlene Owoc that the Master Leases and subsequent Equipment Schedules would be on the basis of a $1.00 purchase option, or an option of not more than 10% of the purchase price, depending on the applicable Rate Factor.

31.     These representations were consistent with the nominal "Residual" payoff alternatives listed on the Proposal.

32.     Darlene Owoc related the above-described oral representations to Mr. Owoc before he signed the Master Lease and the Equipment Schedules on behalf of VPX. Thus, Mr. Owoc executed the Master Lease and related Equipment Schedules reasonably relying on White's representations that the leases were conditional sales with nominal payoff options, and that he would own the Equipment at the end of the lease terms. Specifically, before and when executing the Master Lease and related Equipment Schedules, and at all times relevant to this cause, Mr. Owoc reasonably believed that all of the leases included the first nominal payoff option contained in the Proposal and in White's representations, i.e., were "dollar out" leases, because Balboa was utilizing the applicable rate factor for the "dollar out" payoff option.

33.     These statements by White to Darlene Owoc and VPX were material misrepresentations. White knew the representations were false when made.

34.     Balboa had a then existing but concealed plan and scheme to claim, when the Leases terminated, that VPX was obligated to pay Balboa the full alleged fair market

value of the equipment, rather than the promised nominal payoff amount. Indeed, Balboa has recently claimed that VPX is obligated to pay Balboa a purchase option of 50% of the original purchase price of the ES003 equipment, even though the Master Lease and Equipment Schedules contain no such provision.

35.    VPX would never have entered into the Master Lease and Equipment Schedules if Balboa had disclosed, and not suppressed and concealed, this pre-existing scheme.

36.    Mr. Owoc signed the Master Lease and Equipment Schedules in reliance on such representations. Mr. Owoc would not have signed the Master Lease and Equipment Schedules if he had known that the representations were false. Based upon Balboa's oral and written representations, Mr. Owoc reasonably believed that VPX would have title to the leased equipment at the end of the initial lease terms for a $1.00 purchase option because Balboa was using the rate factor applicable to the "dollar out" purchase option.   In the alternative, the leases would have been subject to a maximum option "cap" of 10% of the purchase price, if the lower rate factor was utilized.

## VII.    ADDITIONAL ALLEGATIONS REGARDING MASTER LEASE AND EQUIPMENT SCHEDULES

37.    The Master Lease contains a "death grip" provision whereby the Lease purportedly may only be terminated by the Lessee at the end of the base term if it gives one hundred twenty (120) days prior written notice of termination to Balboa by certified mail. *See* Exhibit A, ¶ 2. Otherwise, the subject lease renews automatically for six (6) months at the rent stated in the relevant Equipment Schedules, and for successive three month periods until such written notice is provided by Lessee. *Id.* However, the Master

Lease also requires the lessee to return the equipment to Balboa upon termination of the lease "unless the Lessee shall have duly exercised any purchase option." *Id.* at ¶ 18.

38.     Contrary to custom and usage of trade in the industry, the Master Lease is silent as to the details of any purchase option at the end of each lease term (although the Master Lease refers in general terms to exercise of a purchase option which is unspecified as to amount in ¶ 18).

39.     Therefore, the surrounding facts and circumstances determine the rights of the parties at lease termination.

40.     The course of dealing between Balboa and VPX further confirms that Balboa actually provided VPX with the lesser $1.00 option.  This is because Balboa charged VPX the Rate Factor applicable to the $1.00 purchase option in the Proposal or an annualized interest rate of approximately 7% for all Equipment Schedules subject to the Master Lease.

41.     While the Master Lease and the Equipment Schedules were all in force, White sent an August 6, 2010 email to VPX (the "White email") representing that Balboa would assume only a 10% residual fair market value purchase option at the end of the leases.  This representation was, of course, consistent with the 10% "Residual" option in the Proposal.  A true and correct copy of this email is attached hereto as Exhibit H.

42.     VPX again relied upon the representation by White that VPX's maximum purchase amount would be 10% of the purchase price, depending upon the Rate Factor.

43.     In August 2012, Rich Cimino of VPX reconfirmed to Mr. White that the Master Lease and the Equipment Schedules had a "cap" of 10% for residual value ("[Y]our email dated August 6, 2010 confirmed that all of the leases we arranged through

11

you were based on a 10% residual assumption").  Mr. White responded by wrongfully denying that his August 2010 email regarding Balboa's assumption of 10% residual value was applicable to the Master Lease and Equipment Schedules.  This email chain on August 22, 2012, is attached hereto and incorporated herein as Exhibit I.

44.     White's denial of the application of the 10% residual purchase option clearly promised in his August 2010 email to the Master Lease and Equipment Schedules was part of Balboa's pre-existing and ongoing but concealed plan and scheme to "spring" a purported full market value purchase requirement on VPX as the Master Lease and Equipment Schedules were expiring.

## VIII.    BALBOA'S GROSS OVERCHARGES UNDER THE ES001 SCHEDULE

45.     The ES001 Lease commenced in February 2009.  The Schedule provided for quarterly payments in the amount of $9,985.59.  The Schedule also provides for a "base term" of 12, meaning 12 quarterly payments.  Thus, the term of the ES001 Lease is three (3) years.

46.     VPX accounts payable personnel were not familiar with the nature of this lease transaction and reasonably believed that this billing was appropriate.  These employees were not knowledgeable or sophisticated about commercial lease transactions and relied on Balboa's billings to be accurate.

47.     The ES001 Lease expired in or about January 2012.  Because the ES001 Lease was properly a $1.00 purchase transaction, VPX owned the equipment at that point. Accordingly, Balboa did not collect any further rent for many months.

48.     Then, completely without any justification, Balboa collected rent in the quarterly amount of $9,985.59 in September, 2012.

49.     Once Balboa determined that it could get away with overcharges, Balboa became even bolder in its misconduct.

50.     Beginning on or about January 2013, Balboa began billing VPX for monthly payments in the same amount of $9,985.59.  (The amount of the quarterly payments during the lease term.)  There was absolutely no justification for converting quarterly rental payments under the -001 Lease to monthly payments in the same amount after the expiration of that Lease.  The blatantly wrongful practice of continuing to collect monthly payments in the amount of $9,985.59 continued throughout 2013 until Balboa provided VPX with a Bill of Sale for the ES001 equipment dated December 21, 2013.

51.     As a result, Balboa has grossly overcharged VPX for rents under the -001 Lease in the approximate amount of $100,000.00.

52.     Similarly, the -003, -004 and -005 Equipment Schedule were all signed on November 16, 2009, and expired as of the end of 2013. (These Leases each were for a four (4) year term as provided by the applicable Equipment Schedules.)

53.     These transactions were all, in fact, conditional sales and Balboa should have provided VPX with four separate Bills of Sale upon the expiration of the applicable lease terms at the end of 2013.

54.     However, Balboa has wrongfully continued to collect quarterly rental payments under the -003, -004 and -005 Leases, thereby grossly overcharging VPX under these leases, as well as the -001 Lease.

## IX.   OTHER BALBOA MISCONDUCT

55.     On April 8, 2014, in response to the request for payoff information and Bills of Sale, Balboa responded with a purported fair market value payoff quote for

ES003 only, in the amount of $88,695.50, more than 50% of the original purchase price of the ES003 Equipment. This demand was grossly in excess of the 10% "Residual" purchase option which should have been the "cap" or maximum purchase price.

56.     Balboa assigned ES003, ES004 and ES005 to Wells Fargo equipment Finance, Inc. ("Wells Fargo"). On May 15, 2014, Wells Fargo notified VPX that it was releasing its security interests in the Equipment because the contracts had been "paid in full" as of that date.

57.     In response to receiving the Bill of Sale on ES001 and the notice of Wells Fargo's release of its security interests in the remaining Equipment, in May 2014, VPX requested by email from Balboa similar status and payoff information and Bills of Sale on the ES003, ES004 and ES005 as it had received for ES001, all of which were governed by the same Master Lease.

58.     Balboa responded in an email on May 23, 2014 that "As Balboa is the owner of the equipment you will need to forward the purchase price on the equipment should you wish to receive a bill of sale for each." The response is contrary to the position Balboa took with regard to ES001 when it provided a Bill of Sale (while also concealing the nature of its gross overcharges).

59.     On June 5, 2014, Balboa changed its position again, stating by email that VPX was "only leasing the equipment", and that VPX would have to continue to pay quarterly rent until all the customized, installed Equipment was removed from VPX's premises and returned to Balboa. In other words, Balboa withdrew the purchase options (in unspecified amounts) which it had expressly provided to VPX less than two weeks before.

60.     This mirrored Balboa's change of position in August 2012, when White claimed that this August 2010 email confirming a 10% residual assumption did not apply to the Master Lease and the Equipment Schedules.

61.     In October 2014, VPX sent additional requests to Balboa for status information and payoff options for ES004 and ES005, to which-- as of the date of filing this Complaint-- Balboa also has failed to respond.

62.     After Balboa ignored repeated requests from VPX regarding the status and payoff information on ES004 and ES005, on or around October 7, 2014, Balboa notified VPX of its intent to file a default notice on purported amounts past due on ES004 and ES005.  There are no defaults and this constitutes wrongful conduct by Balboa.

**X:     SUMMARY OF BALBOA'S "BAIT AND SWITCH" TACTICS**

63.     Balboa's intentionally deceptive "bait and switch" tactics and practices may be briefly summarized as follows:

(a)     Balboa enticed VPX with a promise of low interest rate factors;

(b)     Balboa assured VPX that it would own the leased equipment at the end of the initial lease term based on either a $1.00 purchase option or a maximum cost of ten percent (10%) of the purchase price of the equipment, depending upon the applicable rate factor;

(c)     the rate factor was higher for a $1.00 purchase transaction than for a ten percent (10%) purchase option because VPX owed no money (beyond the hypothetical $1) to acquire title to the equipment at the end of the lease term;

(d)     Balboa's initial Proposal specifically included a "Residual Option" column and the $1.00 and 10% options;

(e)   in subsequent proposals, Balboa deleted the Residual Option column for the purpose of confusing and deceiving VPX;

(f)   under the "$1.00" option in the Proposal, the annualized interest rate was approximately seven percent (7%);

(g)   on each of the four leases in issue, Balboa charged rent at the same annualized rate of approximately seven percent (7%);

(h)   Balboa changed the periodic rent from monthly to quarterly under the ES003, ES004, and ES005, to further confuse VPX and disguise the actual rate factor on an annualized basis;

(i)   Balboa ascertained that the VPX accounts payable personnel were not sophisticated or knowledgeable relating to commercial lease transactions;

(j)   in the summer of 2010, the issue arose as to the applicable purchase options;

(k)   on August 6, 2010, White advised VPX by email that "we only assume a 10% residual" . . . on our leases."

(l)   at all times during the initial terms of the four leases, VPX reasonably believed and understood that it would acquire title to the leased equipment at the end of the respective lease terms for either a $1.00 purchase option or a maximum "cap" of 10% of the equipment's purchase price;

(m)   VPX did not know that Balboa had a secret and undisclosed intention to claim that VPX would owe the full fair market value of the equipment, as determined by Balboa, at the end of each lease;

(n)    specifically, VPX had no knowledge, and had never agreed, that Balboa would be entitled to charge a full fair market value purchase price option of 50% or more of the equipment's original purchase price; and

(o)    in August 2012, White wrongfully denied that the 10% option applied to the Master Lease and Equipment Schedules.

## XI. COUNTS

### COUNT ONE

### DECLARATORY JUDGMENT AS TO MASTER LEASE, EQUIPMENT SCHEDULES AND OWOC GUARANTY

64.    Plaintiffs restate, re-allege and incorporate all material allegations contained in Paragraphs 1 through 63 of this Complaint as if fully set forth herein.

65.    Balboa's initial lease proposal indicated that the Master Lease and related Equipment Schedules are, properly construed, conditional sales and not "true" leases. Accordingly, the leases have been fully paid off.

66.    In the alternative, the maximum amount that VPX would owe Balboa is 10% of the purchase price contained in each of the Equipment Schedules.  Already, Balboa's overcharges exceed 10% of the value contained in each Schedule.

67.    Balboa has expressly refused to honor the Leases and Equipment Schedules as conditional sales.  Balboa has demanded $88,695.50 as a pay-off for the ES003 equipment.  Balboa has refused to provide Bills of Sale on any claimed pay-off obligation for the ES004 and ES005 equipment while also claiming that it is entitled to be paid full fair market value as a purchase price.

17

68.     Balboa has grossly overcharged and collected excessive rent from VPX under the Leases.

69.     Because these Leases have been fully paid as conditional sales, John Owoc has no obligation to Balboa under his guaranty.

70.     Accordingly, there is an actual justiciable controversy and it is appropriate for this Court to issue a declaratory judgment with respect to the rights of both VPX and Owoc under 28 U.S.C. § 2201.

## COUNT TWO

## BREACH OF CONTRACT

71.     Plaintiffs restate, re-allege and incorporate all material allegations contained in Paragraphs 1 through 70 of this Complaint as if fully set forth herein.

72.     A valid and enforceable conditional sale agreement exists between Balboa and VPX, with an option for VPX to purchase the leased Equipment at the end of the lease term for a nominal amount not to exceed 10% of the purchase price of the Equipment.

73.     Balboa breached this agreement by refusing to allow VPX to exercise its purchase option, and instead demanding return of the equipment at VPX's sole expense, continued payment of significant rent by VPX, or payment of a grossly excessive purported fair market value for the used ES003 equipment.

74.     VPX has been damaged by Balboa's breach of contract in the form of overpayment on the leases, the loss of the benefit of its bargain with Balboa, the inability to own the valuable Equipment at the end of the lease term as promised, and the necessity and cost of filing suit over the leases, among other things.

75.     Under the Master Lease, VPX is also entitled to recover attorneys' fees if it is a prevailing party.

### COUNT THREE

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

76.     Plaintiffs restate, re-allege and incorporate all material allegations contained in Paragraphs 1 through 75 of this Complaint as if fully set forth herein.

77.     VPX and Balboa entered into a valid lease-purchase agreement in the form of the 2008 Master Lease and its related Equipment Schedules and subsidiary leases.

78.     VPX did all, or substantially all, of the significant things the contract required it to do with regard to the equipment leases at issue, specifically paying the agreed to rent for the duration of the lease term.

79.     All conditions required for Balboa's performance under the Master Lease have occurred.  Specifically, VPX has paid all agreed upon rents; the lease terms on ES003, ES004 and ES005 have expired; and VPX is entitled to receive payoff information on the leased Equipment not to exceed one dollar ($1.00) or 10% of the purchase price of the Equipment, so that it may obtain Bills of Sale on all the Equipment.

80.     Balboa's refusal to tender said payoff information and Bills of Sale unfairly interferes with VPX's receipt of the contract's benefits.

81.     Balboa's conduct does not comport with VPX's reasonable contractual expectation that it would own, or be able to purchase for a nominal amount, the subject Equipment at the end of the lease terms, and VPX has been materially harmed thereby.

82.     Accordingly, Balboa breached the covenant of good faith and fair dealing implied in every contract by Florida law.

## COUNT FOUR

### VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), FLA. STAT. §§ 501.201, ET SEQ.

83.     Plaintiffs restate, re-allege and incorporate the allegations contained in Paragraphs 1 through 82 of this Complaint as if fully set forth herein.

84.     FDUTPA provides that any unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce is unlawful.

85.     Balboa's conduct alleged herein constituted actionable unfair, unconscionable and deceptive conduct under FDUTPA.

86.     As a direct and proximate result of the Defendant's violations of FDUTPA, Plaintiffs have suffered actual damages in an amount to be determined at trial, including but not limited to the full value of the rent overcharges and such other damages as proof at trial may show.

## COUNT FIVE

### UNJUST ENRICHMENT

87.     Plaintiffs restate, re-allege and incorporate the allegations contained in Paragraphs 1 through 86 of this Complaint as if fully set forth herein.

88.     In the alternative to its breach of contract claim, VPX seeks recovery of amounts of rent overcharges by which Balboa was unjustly enriched as a result of its improper conduct alleged herein.

89.     VPX conferred significant monetary benefit upon Balboa by, among other things, duly paying rent on the Leases.  In addition, Balboa has grossly overcharged VPX for rents under the Master Leases and Equipment Schedules.

90.     Balboa voluntarily accepted and retained these monetary benefits with knowledge that it did not intend to honor the end of term payoff options on the subject Equipment.

91.     Thus, Balboa has been unjustly enriched, and its illicit conduct makes it inequitable for the Defendant to retain those benefits without paying the value of the benefit back to VPX.

**COUNT SIX**

**<u>FRAUD</u>**

92.     Plaintiffs restate, re-allege and incorporate the allegations contained in Paragraphs 1 through 91 of this Complaint as if fully set forth herein.

93.     Balboa fraudulently induced VPX to enter into the -001, -003, -004 and -005 leases based upon the oral and written misrepresentations alleged herein.

94.     Balboa knew that these representations were false when made.

95.     At the time of the representations, Balboa intended that its future actions regarding the Leases and Equipment Schedules would be contrary to such representations.

96.     Balboa intended VPX to rely on these false oral and written misrepresentations.

97.     Balboa's fraud has been intentional and pre-meditated as part of an on-going scheme to deceive VPX.

98.     VPX has reasonably relied to its detriment on these oral and written misrepresentations.

99.   VPX is entitled to recover punitive damages to punish and deter Balboa as a result of its intentional fraud.

## COUNT SEVEN

### SUPPRESSION AND CONCEALMENT

100.   Plaintiffs restate, re-allege and incorporate the allegations contained in Paragraphs 1 through 99 of this Complaint as if fully set forth herein.

101.   Under the facts and circumstances alleged herein, Balboa had a duty to disclose and not suppress material facts relating to the Master Lease and the Equipment Schedules.

102.   Balboa is a sophisticated commercial lessor and had superior knowledge regarding the matters involved with the Master Lease and Equipment Schedules.

103.   Balboa intentionally and wrongfully concealed, suppressed, and failed to disclose material facts relating to its pre-existing scheme which was in force at all material times, including when VPX executed the Master Lease and Equipment Schedules.

104.   Specifically but not exclusively, Balboa concealed, suppressed, and failed to disclose the materials facts that it intended to reject and disavow Balboa's repeated oral and written representations that VPX would have an option to purchase all of the leased equipment at the end of the initial term of the leases for either a $1.00 purchase option or, a maximum "cap" purchase option of 10% of the original purchase price of the equipment.

105.   Balboa further concealed, suppressed, and failed to disclose the material fact that, as the leases approached expiration, Balboa intended to wrongfully claim that VPX owed the alleged full fair market value of the leased equipment.

106.    Balboa acted in bad faith in concealing, suppressing and failing to disclose these material facts.

107.    Balboa knew that if Balboa had disclosed these material facts and its pre-existing scheme, VPX would be induced to act by signing the Master Lease and the Equipment Leases.

108.    If Balboa had disclosed its pre-existing scheme, VPX would not have executed the Master Lease and Equipment Schedules.

109.    VPX is entitled to recover punitive damages to punish and deter Balboa as a result of its intentional suppression, concealment and failure to disclose.

## XI.    **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for the following relief:

A.    Under Count One, that the Court enter judgment declaring that (1) the Master Lease and related Equipment Schedules and subsidiary leases are not "true leases" but rather conditional sale agreements; (2) the Leases have been paid in full and VPX is entitled to Bills of Sale on all the Equipment at issue; (3) in the alternative, the maximum amount that VPX would owe Balboa is 10% of the purchase price contained in each of the Equipment Schedules, and that Balboa's overcharges exceed 10% of the value contained in each Schedule; and (4) that John Owoc has no obligation under his guaranty;

B.    Under Count Two, that the Court enter judgment awarding Plaintiffs compensatory damages for Defendant Balboa's breach of contract including rent overcharges and prevailing party attorneys' fees;

C.    Under Count Three, that the Court enter judgment awarding Plaintiffs compensatory damages for Defendant Balboa's breach of the implied covenant of good faith and fair dealing;

D.    Under Count Four, that the Court enter judgment awarding Plaintiffs compensatory damages and attorneys' fees for Defendant Balboa's violations of FDUTPA;

E.    Under Count Five, that the Court order restitution and payment to VPX of the amounts by which Balboa has been unjustly enriched as a result of its overcharges to VPX;

F.    Under Count Six, that the Court enter judgment against Balboa for compensatory and punitive damages as a result of Balboa's fraud;

G.    Under Count Seven, that the Court enter judgment against Balboa for compensatory and punitive damages as a result of Balboa's suppression, concealment, and failure to disclose; and

H.    That the Court award VPX its attorneys' fees, pre-judgment and post judgment interest, costs and such other legal and equitable relief as may be appropriate.

## JURY TRIAL DEMAND

**Plaintiffs hereby respectfully demand a trial by jury.**

Dated this 30th day of October, 2014.

Respectfully submitted,

  /s/ Marc J. Kesten
Marc J. Kesten, Florida Bar No. 691801
General Counsel and Attorney for Plaintiffs
Vital Pharmaceuticals, Inc. and John Owoc
1600 North Park Drive
Weston, FL 33326
Phone:  954 641 0570, Ext. 293
Direct:  954 349 4505
Fax:  954 389 6254
Email:  Marc.Kesten@vpxsports.com

**OF COUNSEL**

Jonathan H. Waller
(Pro Hac Vice Application Being Submitted)
Tracy H. Slaughter
(Pro Hac Vice Application Being Submitted)
Waller Law Office, PC
2001 Park Place, Suite 900
Birmingham, AL  35203
Phone:  (205) 313-7330
Direct:  (205) 313-7331
Cell:  (205) 601-9053
Email:  jwaller@waller-law.com

**Defendant's Address:**

2010 Main Street
11th Floor
Irvine, CA 92614